IN RE JEROME DALY.

189 N. W. (2d) 176.

July 16, 1971—No. 42174.

*Herbert C. Davis,* for petitioner.
*Jerome Daly,* pro se, for respondent.

PER CURIAM.

This is a disciplinary proceeding conducted in accordance with the rules of this court governing professional responsibility of members of the bar of Minnesota admitted and licensed to practice as attorneys at law.

Upon our decision in In re Daly, 284 Minn. 567, 171 N. W. (2d) 818, adjudging respondent, Jerome Daly, to be guilty of contempt of this court and ordering his temporary suspension from the practice of law, an investigation into his fitness and competence to continue to practice before courts of this state was made by the State Board of Law Examiners.[1] Thereupon, a petition and accusation filed by the board for respondent's disbarment, together with his answer, were, as authorized by our rules,[2] referred to the Honorable Donald C. Odden, Judge of the District Court of the Sixth Judicial District, who was appointed as referee to hear and report the evidence.[3] Following an 8-day evidentiary hearing and submission of an 808-page verbatim transcript of the testi-

---

[1] During the pendency of these proceedings, the functions of the State Board of Law Examiners were transferred to the State Board of Professional Responsibility and the State Administrative Director on Professional Conduct.

[2] Rule I, Rules of the Supreme Court for Discipline and Reinstatement of Attorneys (283 Minn. ix), now Rule 8, Minnesota Supreme Court Rules on Professional Responsibility, adopted December 16, 1970.

[3] The Honorable E. R. Selnes, retired judge of the District Court of the Eighth Judicial District, was originally appointed referee. Upon his request, after respondent filed an affidavit of prejudice, Judge Selnes was relieved of the assignment and Judge Odden was appointed.

mony, the referee, in compliance with the rules and the order of appointment, filed comprehensive findings of fact, conclusions, and a recommendation that respondent be disbarred. We have examined the evidence with care and are constrained to adopt the fully supported findings of the referee and to order respondent disbarred for numerous acts of unprofessional conduct.

As covered in detail in In re Daly, *supra,* respondent, without justifiable explanation or excuse, intentionally and defiantly disregarded an order of this court prohibiting him and a justice of the peace from further proceedings in a declaratory judgment action, then pending before the justice of the peace, which was obviously, and for numerous reasons outlined in our decision, beyond the limits of jurisdiction of a justice of the peace. In finding respondent in contempt and ordering his temporary suspension from practice because of the extraordinary nature of his professional behavior, we recognized that a conviction of contempt of court ordinarily does not reflect on an attorney's fitness, trustworthiness, or competence. Accordingly, we authorized respondent to apply for limited exceptions to the suspension order so that he might complete matters pending in his office. Further, we stated:

"We reserve jurisdiction of this matter to permit further proceedings, the object of which will be to determine whether this contumacious conduct of Jerome Daly is or is not an isolated instance of impropriety. * * *

* * * * * *

"* * * Final resolution of the matter must depend on whether the acts of this attorney are a part of a persistent and continuing effort to defy the authority of the courts and in part on whether there is any disposition to amend the contumacious behavior demonstrated." 284 Minn. 568, 571, 171 N. W. (2d) 820, 823.

Contrary to respondent's fanciful assertions that these proceedings are a conspiracy by banks and their directors to put an end to his persistent attacks upon the constitutionality of the monetary system of the United States, disciplinary proceedings, including this one, are not designed to punish an attorney or to prevent him from, in good faith, espousing a legal cause, however unpopular or seemingly untenable, but rather to discharge this court's responsibility to protect the public, the administration of justice, and the profession by imposing disciplinary sanctions, including removal from practice, upon those attorneys who, after careful investigation, proper notice, and hearing, are found to have demonstrated that they do not possess the "qualities of character and the professional competence requisite to the practice of law."

Baird v. State Bar of Arizona, 401 U. S. 1, 7, 91 S. Ct. 702, 706, 27 L. ed. (2d) 639, 647. See, also, Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U. S. 154, 91 S. Ct. 720, 27 L. ed. (2d) 749; Schware v. Board of Bar Examiners, 353 U. S. 232, 77 S. Ct. 752, 1 L. ed. (2d) 796; Hallinan v. Committee of Bar Examiners, 65 Cal. (2d) 447, 453, 55 Cal. Rptr. 228, 233, 421 P. (2d) 76, 81. The United States Supreme Court and all courts recognize that—

"* * * [t]he power of disbarment is necessary for the protection of the public in order to strip a man of the implied representation by courts that a man who is allowed to hold himself out to practice before them is in 'good standing' so to do." Theard v. United States, 354 U. S. 278, 281, 77 S. Ct. 1274, 1276, 1 L. ed. (2d) 1342, 1345.

Although disciplinary proceedings have been described in the context of the requirement of procedural due process as "adversary proceedings of a quasi-criminal nature" (In re Ruffalo, 390 U. S. 544, 551, 88 S. Ct. 1222, 1226, 20 L. ed. [2d] 117, 122), we have noted that they are not considered in the same light as an ordinary adversary action but are proceedings sui generis:

"A disciplinary proceeding is not the trial of an action or suit between adverse parties, but an investigation or inquiry by the court into the conduct of one of its officers in order to determine his fitness to continue as a member of his profession." In re Application for Discipline of Peterson, 260 Minn. 339, 344, 110 N. W. (2d) 9, 13.

Since lawyers are granted a monopoly to perform legal services for hire, it is self-evident that they, like all monopolies, must be subject to strict regulation with respect to admission to practice and to the performance of professional services, as well as to public accountability for adherence to the rule of law, canons of ethics, and standards of professional responsibility.[4] The formulation of ethical principles and standards of professional conduct, as well as the procedures for enforcement, is, and must be, under our constitutional system, the responsibility of the judicial branch of government. The ultimate determination governing admission, supervision, and discipline of attorneys in this state, including their removal from practice before our courts, is vested in this court. In re Disbarment of Tracy, 197 Minn. 35, 266 N. W. 88, 267 N. W. 142.

The ancient and fundamental standards of professional conduct are well established. These standards are taught as a required subject in

---

[4] See, A. B. A., Code of Professional Responsibility, Preamble.

the law schools of this state. Questions concerning them are included in examinations for admission to practice. They are set forth in the Canons of Professional Ethics and, as recently advised, in the Code of Professional Responsibility adopted by the American Bar Association and by this court.[5] As in all disciplinary proceedings, the canons, and now the new code, encompass the standards by which respondent's conduct must be judged in determining his fitness to continue in the practice of law.

An overall view of the voluminous record compels us to agree with the referee's conclusions that respondent—

"* * * has failed to conduct himself in a manner consistent with the ethical principles of the legal profession, has deliberately and intentionally disregarded those ethical principles in the conduct of his practice, has taken unconscionable advantage of his position as a lawyer of this state, has flaunted his disregard for the authority of Judges, Courts, Statutes, and the ethical rules governing conduct required of attorneys, and has offered no persuasive evidence or excuse for his conduct."

Moreover, given every opportunity to explain or justify alleged misconduct as not "a persistent and continuing effort to defy the authority of the courts" (284 Minn. 571, 171 N. W. [2d] 823) but occasioned by inadvertence, misconception of professional responsibilities, or compelled by circumstances not of his making or beyond his capacity to control, respondent exhibited indifference to these proceedings and undertook to use the hearing before the referee as a forum for expounding his own views concerning the constitutionality of the Federal Reserve System and the validity of Federal Reserve notes as well as the constitutionality of our Rules of Civil Procedure and those governing the conduct and discipline of attorneys. By his conduct in representing himself before the referee and upon oral argument before this court, respondent has, at best, demonstrated a perverted misconception of the role and function of an attorney and the necessity for strict regulation and accountability of attorneys or, at worst, a deliberate and defiant

---

[5] Canons of Professional Ethics were adopted May 2, 1955 (241 Minn. xvii) and the Code of Professional Responsibility on August 4, 1970 (286 Minn. ix). Most of respondent's misconduct occurred while the former were in force. The new code, however, retains and reaffirms as disciplinary rules, mandatory in character, the same proscriptions in the older one with which respondent's behavior is equally at odds. Where appropriate, therefore, references to both are cited in this opinion.

rejection of any judicial control of his professional activities.[6] While such a misconception, if it exists, provokes our perplexity and commiseration, it, no less than respondent's intentional, persistent, and habitual misconduct as found by the referee, and his declared intention before this court that he will continue to disobey any court orders or rules governing his professional conduct which he regards as harsh, oppressive, or unconstitutional in the future, leaves us no choice but to order his disbarment.

The ultimate factual findings of the referee, supported by specific and detailed instances and ample evidence, are, in essence, that respondent has "persistently and perniciously" used his position as a licensed attorney, for himself and as counsel for others, to subvert the processes of justice by (1) initiating unfounded lawsuits for the purposes of harassing numerous named banking institutions, public officials, and private persons, and to avoid legal obligations of himself and his clients, thereby depriving parties involved of property to which they were lawfully entitled, causing them very substantial expense, and occupying the time and efforts of courts in nearly all levels of jurisdiction;[7] (2) by advancing in such cases by "immaterial and unnecessarily inflammatory" allegations his personal theory of the unconstitutionality of the monetary system of the United States;[8] (3) by continuing to espouse his theory in spite of repeated rulings by courts of record that his contentions are untenable and unfounded and despite an order of the United States District Court for the District of Minne-

---

[6] At oral argument, respondent not only questioned the constitutional authority of courts to license attorneys or to establish and enforce rules regulating professional conduct but, in expressing his indifference to these proceedings and to the consequences of an order disbarring him, insisted that the right to represent persons in a legal matter derives from the client, not from the courts, and a lawyer's accountability for services rendered should be governed only by faithfulness to his client, his "conscience," and obedience to laws proscribing criminal conduct.

[7] Conduct violative of A. B. A., Canons of Professional Ethics, Canon 30, and of A. B. A., Code of Professional Responsibility, DR 7-102(A)(1).

[8] The United States Court of Appeals for the Eighth Circuit, in affirming a dismissal of a complaint in a purported conspiracy action, characterized the complaint filed by respondent as "16 printed pages of disconnected, incoherent and rambling statements," observing, "At best the complaint represents a euphoric harassment of bank officials, lawyers and federal courts." Koll v. Wayzata State Bank (8 Cir.) 397 F. (2d) 124, 125.

sota restraining him from relitigating the issue, and in contemptuous disregard thereof without seeking appeal of the lower court ruling and orders;[9] (4) by employing tactics in his professional activities deliberately intended to delay the timely and orderly disposition of cases such as failing to appear for hearings and trial; indiscriminately filing affidavits of prejudice, often containing scandalous accusations, against numerous judges;[10] abusing the assertion of the attorney-client privilege; conspiring to conceal and divert assets under the control of a court;[11] and willfully refusing to follow lawful rulings and orders of the courts of the United States and of this state.[12]

We regard as most serious and intolerable respondent's willful, persistent, and continuing unprofessional behavior in defying the authority, rules, and orders of courts. The finding of the referee confirms a pattern of conduct indicated by respondent's contumacious behavior before this court which resulted in his temporary suspension from practice. Indeed, throughout these proceedings, he does not contest his disregard of rules and court orders which he views as unlawful. The following testimony before the referee unmistakably reflects his philosophy of an attorney's obligation in this respect and his disposition to continue such behavior.

---

[9] Referee's findings 4, 4A, 4B, and 4B-III. See, prohibiting "[s]tirring up strife and litigation," A. B. A., Canons of Professional Ethics, Canon 28, made more specific by A. B. A., Code of Professional Responsibility, DR 7-106A, requiring obedience to a ruling of a tribunal.

[10] For example, respondent filed one such affidavit stating as follows: "* * * Further, I believe and so state that [he] has a prejudice against the Declaration of Independence and the Constitution of the United States and the Constitution of Minnesota and a bias in favor of that element advocating the nullification and overthrow of it. That this case involves a dispute with the Lutheran Church, Missouri-Synod, which is composed of preachers arrogating attributes of Diety [sic] to themselves in association with Papal Jewish Hegemony, all of whom are in vortex with each other rotating and operating on a common axis sited in Hell." See, A. B. A., Canons of Professional Ethics, Canon 1, and A. B. A., Code of Professional Responsibility, DR 8-102(B).

[11] See, Peterson v. Bartels, 284 Minn. 463, 170 N. W. (2d) 572, and In re Application for Discipline of Drexler, 290 Minn. 542, 188 N. W. (2d) 436.

[12] See, referee's findings 4B, 4B-II, 4B-III, 5, and 7; A. B. A., Canons of Professional Ethics, Canons 21 and 22; A. B. A., Code of Professional Responsibility, DR 7-101(A)(1) and DR 1-102(A)(4, 5, 6).

"Q. * * * Mr. Daly, you have claimed in the petition in this contempt proceeding, that the Supreme Court had no jurisdiction to enter its order dated September 5, 1969, Exhibit One?

"A. Suspending me from the practice of law.

"Q. You have made the claim that the Court had no jurisdiction to do so and it is an invalid order, is that right?

"A. That is right.

"Q. And you also claim that the order of Judge Lord, holding you in contempt, was an invalid order?

"A. I think that is right.

"Q. And you have indicated that the order of Judge Stephenson—

"A. That is not a lawful order.

"Q. Restraining you from doing anything further or arguing further the constitutionality of the Federal Reserve System, was not valid?

"A. Not a lawful order.

"Q. You have indicated that the Justices of the Supreme Court of Minnesota have executed orders relating to the adoption of Rules of Civil Procedure, which are not lawful orders?

"A. Yes. * * *

"Q. Will you explain to the Court, Mr. Daly, whether it is your belief that an order is lawful only if you think it is lawful?

"A. No, no, it is lawful if it squares with the law.

"Q. And if it squares with the law in your opinion or in whose opinion?

"A. Well, I think any citizen or any person walking the face of the earth has a right to be guided by his own conscience, within the bounds of reason. And I can look at an order and I can make a determination in my mind whether it is lawful or not.

"Q. And whether or not you will follow it?

"A. That is right * * *.

*　*　*　*　*

"Q. Now, Mr. Daly, if an order was issued out of the Supreme Court of the United States determining that the Federal Reserve System was a constitutionally appropriate system, would you follow that order?

*　*　*　*　*

"A. Not if they are going to perpetrate a fraud on the people.

"Q. Let's assume that what they do is to declare the Federal Reserve System is a constitutional system.

*　*　*　*　*

"A. Do you want to know if I would follow the order of the Supreme Court of the United States if they said that the banks had authority to

manufacture money and credit out of nothing; you are asking me if I would follow that?

"Q. Yes, Sir.

"A. I would not."

Because it is elementary that our system of justice is founded on the rule of law, a willful disobedience to a single court order may alone justify disbarment. Minn. St. 481.15, subd. 1(3); In re Application for Discipline of Joyce, 242 Minn. 427, 65 N. W. (2d) 581, certiorari denied, 348 U. S. 883, 75 S. Ct. 124, 99 L. ed. 694.

No useful purpose would appear to be served by repeating the detail of the instances supporting the foregoing summary of ultimate findings, all of which are adopted as the basis for respondent's removal from practice. It should be noted, however, that respondent's persistent and continuing attacks on our national monetary system can hardly be regarded as zealous advocacy or a good-faith effort to test the validity of repeated decisions of courts of record. For, as found by the referee, up to the time of his findings and recommendations respondent had avoided payment of any Federal income tax for 1965 and subsequent years on the asserted ground that he has not received gold and silver coin and, therefore, had no earnings that were taxable.[13] Also, he has taken personal advantage of the system he attacks by borrowing money from a bank to purchase lakeside property, only to subsequently defeat the bank's repossession after mortgage foreclosure by taking the position that the bank's extension of credit was unlawful, obligating him neither to pay the debt nor to surrender possession following expiration of the time to redeem. As detailed in the referee's finding, we regard the tactics employed by respondent in the unlawful detainer

---

[13] Respondent's testimony confirms this finding: "Q. Mr. Daly, the exhibits [respondent's amended tax returns for 1965, 1966, 1967, and 1968] disclosed no figures in which any income was reported by you, is that correct?

"A. Well, they use the sign dollar, which I understand means dollar. And there were no figures disclosed with reference to income, that is right; dollars, as such.

"Q. You interpreted the word dollars to mean gold and silver coins, received by you?

"A. Or their equivalent.

"Q. Which would be a certificate redeemable in gold or silver?

"A. Freely and readily available."

proceedings before the justice of the peace as not only unprofessional but reprehensible.

The misconduct found by the referee, and demonstrated by respondent's oral declarations before this court in violation of the Canons of Professional Ethics, reflects professional irresponsibility to such a degree as to render respondent totally unfit to continue to discharge the duties of an attorney.

Let judgment of disbarment be entered.

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.